**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| JOSIF LANTOS, | ) | Case No. 4:07-CV-03045-WKU-DLP |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **HAWKINS CONSTRUCTION COMPANY'S** |
| | ) | **BRIEF IN SUPPORT OF MOTION** |
| HAWKINS CONSTRUCTION | ) | **FOR SUMMARY JUDGMENT** |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

Hawkins Construction Company ("Hawkins"), by and through counsel and for its Brief in

Support of Motion for Summary Judgment, respectfully states as follows:

## I.   INTRODUCTION

Josif Lantos ("Lantos") alleges that he was discharged by Hawkins because Hawkins

perceived Lantos to be disabled and acted in violation of the Americans with Disabilities Act, 42

U.S.C. § 12111 *et seq.* (the "ADA").   In the alternative, Lantos alleges that he was discharged

because of his national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000(e), *et seq.* ("Title VII").    Lantos also alleges that Hawkins conducted an improper post-

offer, pre-employment physical examination.

Summary judgment is proper on Lantos's ADA claim because Lantos is not qualified to

perform the essential functions of a concrete finisher position, with or without accommodation.

Lantos's ADA claim also fails because Hawkins terminated Lantos not because of any perceived

or actual disability but, rather, because he provided Hawkins false information in his "Employee

Information Kit".

Summary judgment is proper on Lantos's Title VII claim because Lantos is unable to prove his *prima facie* case of discrimination.  More specifically, Lantos is unable to prove that he was meeting the legitimate expectations of Hawkins and that there exist facts that permit an inference of discrimination.  Summary Judgment is proper even if Lantos can establish a *prima facie* case, because Lantos is unable to establish that Hawkins's articulated reason for his termination was a pretext for national origin discrimination.

Finally, summary judgment is proper on Lantos's claim involving the post-offer, pre-employment physical examination because Plaintiff is unable to establish that the examination was improper or that Lantos was damaged therefrom.

## II.  STATEMENT OF FACTS

**A.     The Parties**

1.     At all times relevant hereto, Lantos was a resident of Lincoln, Lancaster County, Nebraska.  *See* Complaint and Demand for Jury trial (attached to Defendant's Notice of Removal) (Doc. # 1), ¶ 1.

2.     Lantos is "non-hispanic being of Bosnian National Origin."  *See* Complaint (Doc. # 1), ¶ 1.

3.     At all times relevant hereto, Hawkins Construction Company was a Nebraska corporation doing business in the state of Nebraska.  *See* Complaint (Doc. # 1), ¶ 2.

**B.     Jurisdiction**

4.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 in that Lantos's cause of action is filed under the ADA and Title VII.  *See* Complaint (Doc. #1), ¶ 4.

2

**C.      Venue**

5.      Venue is proper in the United States District Court for the District of Nebraska pursuant to 28 U.S.C. § 1391(b) in that this action was brought in a judicial district where (1) Hawkins resides and (2) a substantial part of the events or omissions giving rise to the claim occurred.  *See* Complaint (Doc. #1), ¶¶ 2 and 3.

**D.      The Application Process**

6.      Lantos completed an "Application for Employment" for Hawkins on January 23, 2006.   *See* Deposition transcript of Josif Lantos attached to Defendant's Evidence Index as Exhibit C, 13:6-14:4; *see also* Ex. C1.

7.      In the "Education and Training" section of the "Application for Employment", Lantos wrote "Europa".  *See* Ex. C1.

8.      On April 18, 2006, Mark Pope contacted Lantos about a position as a concrete finisher. *See* Ex. C, 30:11-15.

9.      Mark Pope is Hawkins's personnel manager and has worked in that position since December 2005.  *See* Affidavit of Mark Pope attached to Defendant's Evidence Index as Exhibit B, 5:18-22.

10.      On April 19, 2006, Mark Pope offered Lantos a concrete finisher position at Hawkins contingent on a post-offer, pre-employment physical examination.  *See* Complaint (Doc. #1), ¶ 6.

11.      On April 19, 2006, Lantos completed an "Employee Information Kit" for Hawkins.  *See* Ex. C, 31:24-38:10; *see also* C2, p. 1.

12.      The "Employee Information Kit" was completed by Lantos in a Hawkins conference room.  *See* Ex. B, 23:21-24:2.

13.     Mr. Pope was present while Lantos completed the "Employee Information Kit" and was available if Lantos had questions or needed assistance. *See* Ex. B, 23:22-24:2; *see also* Ex. C, 34:8-19.

14.     Lantos did not have any questions while he was completing the "Employee Information Kit". *See* Ex. B, 24:3-6, *see also* Ex. C, 34:8-19.

15.     Included in the "Employee Information Kit" was an "Equal Employment Opportunity Survey". On this document, Lantos marked the box next to "White". *See* Ex. C2, p. 3.

16.     Also included in the "Employee Information Kit" was a "Post Offer Employee Statement." *See* Ex. C2, p. 4.

17.     The "Post Offer Employee Statement" reads in pertinent part as follows:

> I certify that the information contained herein is correct to the best of my knowledge and understand that any false or misleading statements, as well as incomplete statements, will be sufficient cause for rejection of my employment with the Company. I further agree and understand by providing this information; the Company is in no way obligated to employ me.
>
> * * *
>
> I understand that if an employment relationship is established, both parties have the right to terminate their employment "at any time for any reason". I also understand that the Company retains the right to terminate my employment at any time.

*See* Ex. C2, p. 4.

18.     Lantos signed the "Post Offer Employee Statement". *See* Ex. C2, p. 4; *see also* Ex. C, 33:17-25.

19.     Included in the "Employee Information Kit" was a "Post Offer Employment Information" form. *See* Ex. C2, p. 9

4

20.     On the "Post Offer Employment Information" form, Lantos answered "NO" to the following question: "Have you had a previous injury or accident which would impact your job performance or be aggravated by your assigned duties? (If yes, explain.)" *See* Ex. C2, p. 9

21.     On the "Post Offer Employment Information" form, Lantos also answered "NO" to the following question: "Have you ever filed a workers compensation claim? (If yes, explain.)" *See* Ex. C2, p. 9,

22.     Lantos signed the "Post Offer Employee Information" form. *See* Ex. C2, p. 9; *see also* Ex. C, 37:1-11.

23.     On April 19, 2006, Lantos completed a post-offer, pre-employment physical examination at Saint Elizabeth Company Care in Lincoln, Nebraska. *See* Ex. C, 38:16-39:8; *see also* Ex. B1; Ex. B2.

24.     Lantos passed the post-offer, pre-employment physical examination. *See* Complaint (Doc. #1), ¶ 7; *see also* Ex. B, 34:10-14.

25.     Mr. Pope was notified of the passed post-offer, pre-employment examination results on April 19, 2006. *See* Ex. B, 37: 3-17; *see also* Ex. B2

26.     On or after April 19, 2006, a nurse from Saint Elizabeth Company Care contacted Mr. Pope and suggested that he obtain a medical authorization from Lantos. *See* Ex. B, 38:20-39:2.

27.     On April 21, 2006, Lantos signed an authorization for the disclosure of protected health information and provided it to Hawkins. *See* Ex. B, 39:11-20; *see also* Ex. C, 40:10-43:21; C4.

28.     Hawkins provided the April 21, 2006 authorization to Saint Elizabeth Company Care. *See* Ex. B, 41:7-9.

5

29.     On or about April 25, 2006, a nurse from Saint Elizabeth Company Care contacted Mark Pope and told him that "they had some additional concerns about Mr. Lantos, and they recommended further evaluation or further investigation."  Saint Elizabeth Company Care also wanted Mr. Pope "to get consent from Mr. Lantos to make that – to make some additional information available."  *See* Ex. B, 35:11-36:15; 42:15-43:13.

30.     On April 27, 2006, Lantos signed a broader authorization for the disclosure of protected health information and provided it to Hawkins.  *See* Ex. C, 43:22-46:23; *see also* Ex. C5.

31.     On April 27, 2006, Hawkins provided the April 27, 2006 authorization to Saint Elizabeth Company Care.  *See* Ex. B, 44:1-45:13.

32.     In response to the authorization, on April 27, 2006, Saint Elizabeth Company Care faxed Mark Pope a June 24, 2003 "Impairment Rating" prepared by Dr. Karen Phillips at Saint Elizabeth Company Care.  *See* Ex. A2; *see also* Ex. B, 6-13; Ex. B4.

33.     The "Impairment Rating" states, in pertinent part, as follows:

> [Lantos] reports that he can walk one to two blocks before having to stop.  His pain is worse with bending, lifting, prolonged sitting, and prolonged walking.  His pain is improved with lying down, taking Aleve, and utilizing a pillow . . . He has never returned back to work, since the injury of September 2002.  He currently is able to do some shopping for his own groceries, but reports that walking in Wal-Mart is too far and requires him to rest.  He reports performing no significant activity, other than some of these home activities.

*See* Ex. A2, p. 2; *see also* Ex. B4.

34.     The "Impairment Rating" further states, in pertinent part, as follows:

> Mr. Lantos does have a significant history of recurrent back pain.  In the past, he has been treated for his degenerative disk disease and has previously been given a 5% impairment rating.  Subsequently, however, he was able to return back to heavy work and has been working as a concrete finisher.  However, at this point, it does appear that his degenerative disk disease is significant enough to continue to keep him away from work.  It does appear that his current diagnosis and symptoms are the result of an aggravation of a pre-existing back condition. . . . Based on my evaluation of Mr.

6

> Lantos, I would place him at a light physical demand classification indicating that he could lift up to 20 pounds, with avoidance of repetitive bending and stooping.

*See* Ex. A2, p. 3; *see also* Ex. B4.

35.     Relying on the "Impairment Rating", Mark Pope determined that Lantos provided false information in his "Employee Information Kit", specifically to questions numbers six (6) and seven (7) on the "Post Offer Employment Information" form.  *See* Ex. B, 46:15-47:9, 52:18-22; *see also* Ex. B5; Ex. C2, p. 9.

36.     On or about April 27, 2006, Mark Pope informed Lantos that he no longer had the position as concrete finisher for Hawkins.  *See* Ex. B, 61:23-63:5.

**E.     The Essential Functions of a Concrete Finisher**

37.     The primary purpose of a "concrete finisher" is to:

> Smooth and finish surfaces of poured concrete floors, walls, sidewalks, or curbs to specified textures, using hand tools or power tools including floats, trowels, and screeds.

*See* Affidavit of Mark Pope attached to Defendant's Evidence Index as Exhibit A, ¶¶ 7 and 8; *see also* Ex. A1.

38.     The duties of a "concrete finisher" include the following:

   a.     Spread concrete to specified depth and workable consistency, using float to bring water to surface and produce soft topping;

   b.     Level, smooth, and shape surfaces or freshly poured concrete, using straight-edge and float or power screed;

   c.     Finish concrete surfaces, using power trowel, or wet and rub concrete with abrasive stone to impart finish;

   d.     Remove rough or defective spots from concrete surfaces, using power grinder or chisel and hammer and patch holes with fresh concrete or epoxy compound;

7

e.      Mold expansion joints and edges, using edging tools, jointers, and straight edge;

f.      May sprinkle colored stone chips, powdered steel, or coloring power on concrete to produce prescribed finish;

g.      May produce rough concrete surface, using broom;

h.      May mix cement, using hoe or concrete-mixing machine;

i.      May level subgrade to fine grade specification using a shovel or motorized equipment;

j.      Saw lumber to blueprint dimensions, using hand saw or power tools and nails lumber together; may also include removal of same material;

k.      May specialize in finishing steps and stairways; and

l.      May break up and repair old concrete surfaces, using pneumatic tools.

*See* Ex. A, ¶¶ 7 and 8; *see also* Ex. A1.

39.     In addition to those duties described in the previous paragraph, a "concrete finisher" also has the following duties:

a.      Smoothing and finishing concrete;

b.      Using finishing tools to seal and texture concrete surfaces;

c.      Carry shovels of concrete to fix imperfections in the concrete surface;

d.      Pouring concrete from a truck or pump;

e.      grading rock or dirt to prepare the surface for concrete;

f.      setting metal forms to hold the concrete; and

g.      driving of steel pins into the ground with a sledge hammer to secure concrete forms.

*See* Ex. A, ¶ 10.

8

40. The position of "concrete finisher" has the following physical requirements:

> Climb and maintain body balance; use hands and arms fully; stand, kneel, bend, crouch, and crawl for long periods, and see well (either naturally or with correction). The employee in this position must be capable of exerting in excess of 50 to 100 pounds of force frequently to move objects.

*See* Ex. A, ¶¶ 7 and 8; *see also* Ex. A1.

41. Approximately 75% of a concrete finisher's day involves kneeling or bending. *See* Ex. A, ¶ 11.

42. Approximately 25% of a concrete finisher's day involves standing. *See* Ex. A, ¶ 12.

43. Approximately 75% of a concrete finisher's day involves smoothing and finishing concrete. *See* Ex. A, ¶ 13.

44. Approximately 25% of a concrete finisher's day involves set-up tasks including grading rock or dirt to prepare the surface for concrete, setting metal forms to hold the concrete, and driving of steel pins into the ground with a sledge hammer to secure concrete forms. *See* Ex. A, ¶ 14.

45. A concrete finisher is required to push and pull concrete with finishing tools. *See* Ex. A, ¶ 15.

46. Concrete is a dense, heavy material. *See* Ex. A, ¶ 16.

47. Lantos's understanding of his duties as a concrete finisher include "I don't have to lift so much, just finish concrete, set up for all day long. You know, in the morning, pour concrete; and in the afternoon, set up. Easy, you know." *See* Ex. C, 18:4-9.

48. Lantos admits that working with concrete is a "physical job." *See* Ex. C, 72:21-23.

49. Lantos admits that working with concrete requires you to "bend over" for long periods of time. *See* Ex. C, 73:1-10.

9

### F.     False Information

50.     Lantos has had six (6) prior workers' compensation injuries and claims.  They were in October, 1992; October, 1995; February, 1998; July, 1998; January, 2001; and September, 2002. *See* Ex. C, 86:19-94:21.

51.     Lantos was told by his doctor that he has chronic low back pain. *See* Ex. C, 73:18-20.

52.     Lantos was told by his doctor that he has degenerative disk disease. *See* Ex. C, 73:21-23.

53.     Lantos admits that he had been previously put on light duty. *See* Ex. C, 73:24-74:22.

54.     Lantos admits that he is currently under restrictions of light duty. *See* Ex. C, 75:5-11.

55.     Lantos was under the care of Dr. Chughtai on January 18, 2006, February 24, 2006, and April 24, 2006 for complaints of neck and back pain. *See* Ex. C, 83:21-86:3; *see also* Ex. C11, C12 and C13.

### G.     Hawkins's Policy on Lying and/or Providing False Information.

56.     Hawkins's policy on lying and/or providing false information is contained in the "Post Offer Employee Statement." *See* ¶ 17, *supra; see also* Ex. A, ¶ 19; Ex. C2, p. 4.

57.     Lantos's acts were of such a severity so as to cause termination. *See* Ex. A, ¶ 20.

58.     Hawkins strictly followed its lying/false information policy in April, 2006 and continues to strictly follow this policy today. *See* Ex. A, ¶ 21.

### H.     No Reasonable Accommodation

59.     Hawkins's concrete crews cannot reasonably accommodate an individual restricted from "bending and stooping".  There is no alternative similar position that does not require significant "bending and stooping". *See* Ex. A, ¶ 22.

60.     There is no feasible physical accommodation which would allow a person restricted

from "bending or stooping" to perform the essential functions of a concrete finisher.  If Hawkins completely restructured the job description of concrete finisher to remove "bending and stooping" it would remove 75% of that position's work.  *See* Ex. A, ¶ 23.

## I.      National Origin Discrimination under Title VII.

61.     Lantos claims that Hawkins "chose to hire an hispanic (sic), rather than hiring someone of non-hispanic (sic) national origin."  *See* Complaint (Doc. #1), ¶ 12.

62.     Lantos testified that as follows:

> When, when [Mark Pope] call me to fill out all the paper, when I go to the office, it was a bunch of Mexican.  I'm not a racist; everybody, you know, same thing, like everybody same for me.  I'm not a racist.  Mexican or Romanian or Hungarian; it's, for me, it's everybody's part.

> I knew right away; I knew right away that he no hire me, because that people work for less money, work for seven, eight dollars.  Why he have to pay me you know 16, 17 dollars and they pay to the, the Mexicans, you know, no paper, no anything, all under table, all seven, eight dollar an hour; that's why he don't.

> I knew right away he don't hire me. I knew why; it was, 100 percent, it was a bunch of, you know, Mexicans, you know.

*See* Ex. C, 30:16-31:9.

63.     In his deposition, Lantos answered "No" to the following question: "did anyone ever say that : I'm not going to hire you because of your color or your national origin?"  *See* Ex. C, 56:5-10.

64.     At the time of the events herein, Mr. Pope did not know that Lantos was Bosnian. The only thing that Mr. Pope knew was that Lantos was from Europe.  *See* Ex. B, 25:12-25.

11

### III.   SUMMARY JUDGMENT STANDARD

"The court should grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Carter v. Ark. Dep't of Human Serv.*, 186 F. Supp. 2d 993, 997-98 (W.D. Ark. 2002) (citing FED. R. CIV. P. 56(c)).  In considering a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party who is "entitled to all reasonable inferences – those that can be drawn from the evidence without resort to speculation." *Sprenger v. Southern Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1110 (8th Cir. 2001) (internal quotation marks omitted) (quoting *Kincade v. U.S. Elec. Motors, Inc.,* 219 F.3d 800, 801 (8th Cir. 2000).

An opposing party cannot survive a motion for summary judgment by merely asserting the existence of factual disputes.  *See Schrum v. Kluck*, 249 F.3d 773, 777 (8th Cir. 2000).  The absence of competent evidence to establish the existence of an essential element of the non-moving party's claim requires entry of judgment as a matter of law in favor of the moving party.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Thus,

> If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to her case, then all other facts will be considered immaterial and the moving party will be entitled to judgment as a matter of law.

*Schrum*, 249 F.3d at 777 (internal citations and quotations omitted).

Summary judgment under Rule 56 is an important part of federal civil procedure.

> [T]he Federal Rules of Civil Procedure have authorized for [more than] 60 years motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact.

*Waitek v. Dalkon Shield Claimants Trust*, 908 F. Supp. 672, 675 (N.D. Iowa 1995) (internal quotations and citations omitted). "Thus, summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Id.* (internal quotations and citations omitted).

## IV.   ARGUMENT AND AUTHORITY

**A.     Hawkins Is Entitled To Summary Judgment On Lantos's ADA Claim**.

To establish a prima facia case of employment discrimination under the ADA, a Plaintiff must prove (1) that he has a disability within the meaning of the ADA, (2) that he is qualified to perform the essential functions of the job, with or without accommodation, and (3) that he suffered an adverse employment action because of his disability. *See Epps v. The City of Pine Lawn,* 353 F.3d 588, 591 (8th Cir. 2003); *see also Cravens v. Blue Cross & Blue Shield of Kansas City,* 214 F.3d 1011, 1016 (8th Cir. 2000).

Summary judgment is proper here because Plaintiff Lantos is unable to establish that (1) he is qualified to perform the essential functions of a concrete finisher at Hawkins Construction Company with or without accommodation and (2) he suffered an adverse employment action *because* of his disability. *See Epps,* 353 F.3d at 592 (stating that "[s]ummary judgment is proper if a plaintiff fails to establish any element of his prima facie case") (citing *Nesser v. Trans World Airlines, Inc.,* 160 F.3d 442, 445 (8th Cir. 1998)); *see also Laurin v. The Providence Hosp. and Mass. Nurses Ass'n.,* 150 F.3d 52, 58-59 (1st Cir. 1998) (stating that although it is "relatively rare that a trial court may enter summary judgment . . . since an ADA plaintiff ultimately must shoulder the burden of establishing that she was able to perform all 'essential functions' of her position, [the employee and not the employer] bore the burden of adducing competent evidence from which a

rational factfinder could have found in her favor"); *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1124 (10th Cir. 1995) (stating that summary judgment is proper when a plaintiff presents no evidence to rebut an employer's conclusion as to the essential functions of a job).

>1.   **Lantos cannot perform the essential functions of a concrete finisher at Hawkins with or without an accommodation.**

The second element Lantos must prove to establish a prima facia case of employment discrimination under the ADA is that he is qualified to perform the essential functions of the job, with or without accommodation. *See* 42 U.S.C. § 12111(8). Here, the undisputed facts establish that Lantos cannot make this showing. According to Lantos, he is currently under restrictions of light duty. *See* Ex. C, 75:5-11. In July of 2003, Lantos was restricted to "light physical duty" with instructions to avoid lifting in excess of 20 pounds and "repetitive bending and stooping." *See* Ex. A2, p. 3; *see also* Ex. B4.

The job of concrete finisher requires an employee to exert "in excess of 40 to 100 pounds of force frequently to move objects." *See* Ex. A, ¶¶ 8 and 9; *see also* Ex. A1. Additionally, an average day for a concrete finisher involves kneeling or bending 75 percent of the day. *See* Ex. A, ¶ 11. Indeed, Lantos cannot perform these tasks without an accommodation. Although there is no precise test for determining what is and what is not a reasonable accommodation, it is fair to state that an accommodation is unreasonable if it imposes undue financial burdens, undue administrative burdens or an undue hardship on the operation of the employer's business. *See* 42 U.S.C. § 12112(b)(5)(A); *see also Buckles v. First Data Resources, Inc.,* 176 F.3d 1098, 1101 (8th Cir. 1999). Here, any accommodation would cause all three. *See* Ex. A, ¶ 22. Plaintiff's limitations prevent him from engaging in 75% of that position's work. *See* Ex. A, ¶ 23. In this instance, Lantos is simply unable to establish that a reasonable accommodation is possible as any accommodation

14

would require Hawkins to eliminate 75% of the position's essential functions. *See* Ex. A, ¶ 23. To require Hawkins to make such an accommodation would result in a complete restructuring of the concrete finisher position. Although job restructuring is a possible accommodation under the ADA, an employer "need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee." *See Dropinski v. Douglas County, Neb.,* 298 F.3d 704, 709 (8th Cir. 2002) (citing *Fjellestad v. Pizza Hut of Am., Inc.,* 188 F.3d 944, 950 (8th Cir. 1999)). Considering Lantos's medical restrictions, Hawkins would be required to do just that - eliminate the essential functions of his job and reassign existing workers to either assist or complete Lantos's essential duties - a measure not required by the ADA *Id.* The ADA does not require an employer to create a new position to accommodate a disabled employee or to shift the essential functions of a position to other employees. *See Fjellestad,* 188 F.3d at 948; *see also Treanor v. MCI Telecommunications Corp.,* 200 F.23d 570, 575 (8th Cir. 2000) (quoting *Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1112-13 (8th Cir. 1995)) (finding that "restructuring frequently involves reallocating the marginal functions of a job,' [but] an employer is not required to reallocate the essential functions of a job").

### a.    The essential functions of a concrete finisher at Hawkins.

This Court may consider the following evidence when determining what the essential functions of a parts person include:

> (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs.

*Dropinski v. Douglas County, Neb.,* 298 F.3d 704, 707 (8th Cir. 2002) (citing *Heaser v. The Toro Co.,* 247 F.3d 826, 831 (8th Cir. 2001)); *see also* 29 C.F.R. § 1630.2(n)(3). Here, Hawkins  has

provided this Court with (1) its own determination as to which functions are essential; (2) a written job description; and (3) the amount of time spent on the job performing the functions. *See* Ex. A; *see also* Ex. A1. Each of these sources establish that the essential functions of a concrete finisher at Hawkins include, but are not limited to, the following:

a.   spread concrete to specified depth and workable consistency, using float to bring water to surface and produce soft topping;

b.   level, smooth, and shape surfaces or freshly poured concrete, using straight-edge and float or power screed;

c.   finish concrete surfaces, using power trowel, or wet and rub concrete with abrasive stone to impart finish;

d.   remove rough or defective spots from concrete surfaces, using power grinder or chisel and hammer and patch holes with fresh concrete or epoxy compound;

e.   mold expansion joints and edges, using edging tools, jointers, and straight edge;

f.   may sprinkle colored stone chips, powdered steel, or coloring powerder on concrete to produce prescribed finish;

g.   May produce rough concrete surface, using broom;

h.   may mix cement, using hoe or concrete-mixing machine;

i.   may level subgrade to fine grade specification using a shovel or motorized equipment;

j.   saw lumber to blueprint dimensions, using hand saw or power tools and nails lumber together; may also include removal of same material;

k.   may specialize in finishing steps and stairways;

l.   may break up and repair old concrete surfaces, using pneumatic tools;

m.   carry shovels of concrete to fix imperfections in the concrete surface;

n.   pouring concrete from a truck or pump;

16

o.      grading rock or dirt to prepare the surface for concrete;

p.      setting metal forms to hold the concrete; and

q.      driving of steel pins into the ground with a sledge hammer to secure concrete forms.

*See* Ex. A, ¶¶ 8, 9, and 10; *see also* Ex. A1.

Additionally, the position of "concrete finisher" has the following physical requirements:

Climb and maintain body balance; use hands and arms fully; stand, kneel, bend, crouch, and crawl for long periods, and see well (either naturally or with correction). The employee in this position must be capable of exerting in excess of 50 to 100 pounds of force frequently to move objects.

*See* Ex. A, ¶¶ 8 and 9; *see also* Ex. A1. The evidence establishes that approximately 75% of a concrete finisher's day involves kneeling or bending and 25% involves standing. *See* Ex. A, ¶¶ 11 and 12. Moreover, approximately 75% of a concrete finisher's day involves smoothing and finishing concrete while 25% involves set up tasks including grading rock or dirt to prepare the surface for concrete, setting metal forms to hold the concrete, and driving of steel pins into the ground with a sledge hammer to secure concrete forms. *See* Ex. A, ¶¶ 13 and 14.

> **b.      Lantos's medical limitations prohibit him from performing the essential functions of a concrete finisher.**

Once this Court determines the essential functions of a concrete finisher at Hawkins, it must be determined whether Lantos is able to engage in those activities with or without an accommodation. To do so, this Court must consider Plaintiff's medical restrictions. Here, medical limitations have been placed on Lantos by Dr. Karen Phillips of Saint Elizabeth Company Care. In the report provided to Mark Pope, "[Lantos's] degenerative disk disease is significant enough to continue to keep him away from work." *See* Ex. A2, p. 2; *see also* Ex. B4, p. 3. Moreover, based on Dr. Phillips's  evaluation of Lantos, Lantos was placed "at a light physical demand classification

17

indicating that he could lift up to 20 pounds, with avoidance of repetitive bending and stooping." *See* Ex. A2, p. 2; *see also* Ex. B4, p. 3.   Based on these physical limitations and the essential functions described in section IV.A.1.a, there is no question that Lantos would be unable to perform the essential functions of a concrete finisher.

### 2. Summary judgment is also proper because Lantos did not suffer an adverse employment action ___because___ of his disability.

Summary judgement is proper because Lantos was terminated not because of an existing or perceived disability but, rather, because he provided false information in his "Employee Information Kit."  On the "Post Offer Employment Information" form, Lantos  answered "NO" to the following two questions:

1. Have you had a previous injury or accident which would impact your job performance or be aggravated by your assigned duties? (If yes, explain.)"  *See* Ex. C2, p. 9

2. "Have you ever filed a workers compensation claim? (If yes, explain.)"  *See* Ex. C2, p. 9.

It is undisputed that Plaintiff provided inaccurate answers when he responded with "No" to both of these questions.  Mark Pope became aware of these inaccuracies on April 27, 2006 when Saint Elizabeth Company Care faxed him a June 24, 2003 "Impairment Rating." *See* Ex. A2; *see also* Ex. B, 45:6-47:6; Ex. B4.  The "Impairment Rating" reads, in pertinent part, as follows:

> [Lantos] reports that he can walk one to two blocks before having to stop.  ***His pain is worse with bending, lifting, prolonged sitting, and prolonged walking***.  His pain is improved with lying down, taking Aleve, and utilizing a pillow . . . ***He has never returned back to work, since the injury of September 2002.***  He currently is able to do some shopping for his own groceries, but reports that walking in Wal-Mart is too far and requires him to rest.  He reports performing no significant activity, other than some of these home activities.

*See* Ex. A2, p. 2 (emphasis added).  It goes on to read:

> ***Mr. Lantos does have a significant history of recurrent back pain.*** In the past, he has been treated for his degenerative disk disease and has previously been given a 5% impairment rating. Subsequently, however, he was able to return back to heavy work and has been working as a concrete finisher. However, at this point, ***it does appear that his degenerative disk disease is significant enough to continue to keep him away from work***. It does appear that his current diagnosis and symptoms are the result of an aggravation of a pre-existing back condition. . . . Based on my evaluation of Mr. Lantos, ***I would place him at a light physical demand classification indicating that he could lift up to 20 pounds, with avoidance of repetitive bending and stooping***.

*See* Ex. A2, p. 3 (emphasis added). Relying on the "Impairment Rating", Mr. Pope determined that Lantos provided false information in his "Employee Information Kit". *See* Ex. B4; *see also* Ex. B, 45:23-47:9, 52:18-22; Ex. C2, p. 9. Thereafter, Mr. Pope informed Lantos that he no longer had the concrete finisher position for Hawkins. *See* Ex. 61:23-63:5. Because Mr. Pope had this non-discriminatory reason for terminating Lantos's employment, summary judgment is proper.

The United States Supreme Court resolved a dispute between the Circuit Courts on the effect of after-acquired evidence in 1995. *See McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 115 S. Ct. 879, 130 L. Ed. 2d. 852 (1995). *McKennon* established the black letter rule that:

> where an employer seeks to rely upon after-acquired evidence of wrongdoing by the employee during his or her employment – and this court concludes where the employer seeks to rely on evidence of wrongdoing in the application process – the employer "must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of discharge."

*Deer v. Cherokee County, Iowa,* 183 F.R.D. 642, 647 (N. Dist. Iowa 1999) (quoting *McKennon,* 513 U.S. at 362-63). Here, the undisputed evidence establishes Hawkins's policy that applicants are not offered positions if false information is provided in their employment paperwork. Hawkins requires everyone to sign a "Post Offer Employee Statement" at the time he or she completes the "Employee Information Kit." This statement reads in pertinent part as follows:

> I certify that the information contained herein is correct to the best of my knowledge and understand that *any false or misleading statements, as well as incomplete statements, will be sufficient cause for rejection of my employment with the Company*. I further agree and understand by providing this information; the Company is in no way obligated to employ me.
>
> * * *
>
> I understand that if an employment relationship is established, both parties have the right to terminate their employment "at any time for any reason". I also understand that the Company retains the right to terminate my employment at any time.

*See* Ex. C2, p. 4 (emphasis added). Lantos acknowledged this policy by signing the "Post Offer Employee Statement" on April 17, 2006. *See* Ex. C2, p. 4; *see also* Ex. C, 33:17-25. Hawkins strictly followed this policy in April, 2006 and continues to strictly follow this policy today. *See* Ex. A, ¶ 21. Indeed, the policy was implemented in the present case. It is undisputed that Mark Pope terminated Lantos's employment immediately after he determined that Lantos provided false or misleading information in his "Employee Information Kit.". *See* Ex. B, 46:15-47:9, 52:18-22, 61:23-63:5; *see also* Ex. B5; Ex. C, 73:18-74:22, 75:5-11, 83:21-86:3, 86:19-94:21; Ex. C2, C11, C12, and C13. Because Lantos was terminated for a legitimate, non-discriminatory reason, summary judgment is proper.

**B.    Hawkins Is Entitled To Summary Judgment On Lantos's Title VII Claim**.

Section 703(a)(1) of Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to compensation, terms, conditions or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1). To establish a Title VII violation for disparate-treatment, "the plaintiff must show intentional discrimination." *See LaRocca v. Precision Motorcars, Inc.,* 45 F. Supp. 2d 762, 771 (1999). In other words, "the Plaintiff is required to prove that the employment decision in question was made with a discriminatory intent or motive." *Id.* Discriminatory intent may be shown either

directly or circumstantially through the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green,* 41 U.S. 792 (1973). Here, Lantos has no direct or circumstantial evidence of discriminatory intent.

> **1.** **There is no direct evidence that Hawkins discharged Lantos because of his national origin.**

Hawkins's personnel manager, Mark Pope, made the decision to terminate Lantos. Accordingly, Lantos must prove that Mr. Pope held an unlawful bias against Lantos's national origin and that such bias affected his decision. *Simmons v. Oce-USA, Inc.*, 174 F.3d 913, 915 (8th Cir. 1999); *see also Lacks v. Ferguson Reorganized Sch. Dist.*, 147 F.3d 718, 725 (8th Cir. 1998) (recognizing that only the actions of the independent decision maker are relevant). The record contains absolutely no direct evidence of any bias held by Mark Pope. In fact, Mr. Pope has testified under oath that Lantos was <u>not</u> discharged because of his national origin. *See* Ex. B, ¶ 47:2-3; *see also* Ex. B3.

> **2.** **Lantos cannot satisfy his burden under the *McDonald Douglas* framework.**

Since Lantos has no direct evidence of national origin discrimination, he must resort to proving discrimination circumstantially. As with Lantos's direct proof case, there is no evidence of national origin discrimination under a circumstantial proof method.

The indirect proof scheme developed by the United States Supreme Court in *McDonald Douglas* requires that Lantos first establish a *prima facie* case. To make out a *prima facie* case of discrimination in a discharge action, Lantos must show: (1) he was a member of a protected group or class; (2) he was meeting the legitimate expectations of his employer; (3) he suffered an adverse employment action; and (4) there are facts that permit an inference of discrimination. *Medina-Salas v. Tyson Fresh Meats, Inc.*, 2006 U.S. Dist. LEXIS 67612, Case No. 4:05CV321, *16 (D. Neb.

21

September 20, 2006). If Lantos can establish a *prima facie* case, it is rebuttably presumed that his national origin was a reason for the discharge. To rebut that presumption, Hawkins needs to do nothing more than "articulate" a legitimate, non-discriminatory reason for the discharge. At that point, any inference of discrimination disappears, and Lantos may only resurrect such an inference by proving that Hawkins's articulated reason was a pretext for national origin discrimination. *See LaRocca,* 45 F. Supp. 2d at 771 (quoting *Moschetti v. Chicago, Centeral & Pacific R. Co.,* 119 F.3d 707, 709 (8th Cir. 1997).

Summary judgment is proper in this case because Lantos cannot prove the second and fourth elements of his *prima facia* case. Summary judgment is also proper because Lantos is unable to establish that Hawkins's articulated reason for his termination was a pretext for national origin discrimination.

### a.   Lantos did not and could not meet the legitimate expectations of Hawkins.

The second element of Lantos's prima facie case is that Lantos was meeting the legitimate expectations of his employer. Lantos did not meet Hawkins's expectations. In fact, before Lantos worked even one day on the job, Hawkins discovered that Lantos had provided false and/or misleading information in his "Employee Information Kit." *See* § IV.A.2, *supra.* At that same time, Hawkins also discovered that Lantos would be physically unable to meet its expectations in the future. *See* § IV.A.2, *supra.* After becoming aware of the information concealed by Lantos, it became clear that Lantos could not perform the essential functions of the position. *See* § IV.A.2, *supra.* Accordingly, summary judgment is proper.

22

**b.      No facts exist that permit an inference of discrimination.**

Lantos will be unable to provide the Court with any facts that give rise to an inference of discrimination. The undisputed evidence is that, on April 19, 2006, Mr. Pope offered Lantos a concrete finisher position contingent on a post-offer, pre-employment physical examination. *See* Complaint (Doc. #1), ¶ 6. At that time, Mr. Pope did not even know that Lantos was Bosnian. The only thing Mr. Pope knew was that Lantos was from Europe. *See* Ex. B, 25:12-25; *see also* Ex. C1. Mr. Pope's knowledge regarding Lantos's national origin did not change between April 19, 2006 and April 27, 2006, the date Lantos's employment was terminated. *See* Ex. B, 25:12-25. Had Mr. Pope harbored a prejudice against individuals from Europe or Bosnia, certainly Mr. Pope would have never offered Lantos a position in the first place. The act of hiring Lantos is conclusive evidence that Mr. Pope did not discriminate against him on the basis of national origin when Mr. Pope terminated him just eight (8) days later. *See* Complaint (Doc. #1), ¶ 6; *see also* Ex. B, 61:23-63:5.

**c.      Lantos is unable to establish that Hawkins's articulated reason for his termination was a pretext for national origin discrimination.**

To succeed at the pretext stage, Lantos "must prove that the prohibited reason was a determinative factor in [Hawkins'] decision to terminate." *Medina-Salas v. Tyson Fresh Meats, Inc.*, 2006 U.S. Dist. LEXIS 67612, Case No. 4:05CV321, *16 (D. Neb. September 20, 2006) (quoting *Jones v. United Parcel Svc., Inc.*, 461 F.3d 982 (8th Cir. 2006)). As discussed in section IV.A.2 of this Brief, Mark Pope terminated Mr. Lantos's employment because he provided false information in his "Employee Information Kit." There are no facts to suggest otherwise. Again, it is undisputed that Mark Pope offered Lantos a position just eight (8) days prior to terminating him. *See* Complaint (Doc. #1), ¶ 6; *see also* Ex. B, 61:23-63:5. Termination occurred only after Mr. Pope

23

received the "impairment rating" form Saint Elizabeth Company Care and determined that Lantos

provided false information.  *See* Ex. B, 46:15-47:9, 52:18-22; *see also* Ex. B5; Ex. C2, p. 9.

**C.    Hawkins Is Entitled To Summary Judgment On Lantos's Claim Involving The Physical Examination.**

Paragraph 11 of Lantos's Complaint appears to claim that the post-offer, pre-employment

physical examination occurring on April 19, 2006 was improper.  *See* Complaint (Doc. #1), ¶ 11.

Hawkins is unaware of any law supporting the contention that the examination used in this case was

improper.  In fact, 29 C.F.R. § 1630.14 (7-1-07 ed.) reads as follows:

> (a)    *Acceptable pre-employment inquiry.* A covered entity may make pre-employment inquiries into the ability of an applicant to perform job-related functions, and/or may ask an applicant to describe or to demonstrate how, with or without reasonable accommodation, the applicant will be able to perform job-related functions.
>
> (b)    *Employment entrance examination.* A covered entity may require a medical examination (and/or inquiry) after making an offer of employment to a job applicant and before the applicant begins his or her employment duties, and may condition an offer of employment on the results of such examination (and/or inquiry), if all entering employees in the same job category are subjected to such an examination (and/or inquiry) regardless of disability.
>
> * * *
> (3)    Medical examinations conducted in accordance with this section do not have to be job-related and consistent with business necessity.

29 C.F.R. § 1630.14 (7-1-07 ed.).  Notwithstanding, even if the Court determined that the

examination was improper, summary judgment is still proper because Lantos is unable to establish

that he was damaged by the examination.  Lantos admits that he passed the examination.  *See*

Complaint (Doc. #1), ¶ 7.

## IV.   CONCLUSION

For the reasons set forth above, Hawkins respectfully requests that its Motion for Summary

Judgment be granted and that summary judgment be entered against Lantos on all claims.

DATED this 31st day of August, 2007.

                              HAWKINS CONSTRUCTION COMPANY,
                              Defendant

                    BY:    HARDING & SHULTZ P.C., L.L.O.
                           ADAM J. PROCHASKA – 22307
                           800 Lincoln Square
                           121 S. 13th Street
                           P.O. Box 82028
                           Lincoln, Nebraska 68501-2028
                           (402) 434-3000


                    BY:    s/ Adam J. Prochaska_____
                           One of Said Attorneys


## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of August, 2007, I electronically filed the foregoing with
the Clerk of the Court using the CM/ECF system which sent notification of such filing to the
following:

                    Joy Shiffermiller
                    Shiffermiller Law Office
                    3939 South Street, Suite 101
                    Lincoln, NE 68506


                           s/ Adam J. Prochaska_____
                           One of Said Attorneys