IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JOSIF LENTOS, | ) | |
| | ) | |
| Plaintiff, | ) | 4:07CV3045 |
| | ) | |
| v. | ) | |
| | ) | |
| HAWKINS CONSTRUCTION | ) | MEMORANDUM AND ORDER ON |
| COMPANY, | ) | DEFENDANT'S MOTION FOR |
| | ) | SUMMARY JUDGMENT |
| Defendant. | ) | |
| | ) | |

The plaintiff, Josif Lentos,[1] filed a complaint against Defendant Hawkins Construction Co. (Hawkins) in the District Court of Lancaster County, Nebraska, alleging violations of the Americans With Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101 et seq., and Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e et seq.  (See filing 1, Ex. 1.)  The defendant removed the case to this court, (see filing 1), and filed a motion for summary judgment, (see filing 14).  My analysis of the defendant's motion for summary judgment is set forth below.

## I.   BACKGROUND[2]

The defendant is a Nebraska corporation that performs general construction work in Lincoln, Nebraska.  (Complaint, filing 1, Ex. 1, ¶ 2.)  Mark Pope has worked for the defendant

---

[1] The plaintiff's surname is spelled "Lentos" in the complaint.  (See filing 1, Ex. 1 at 2, 5.) In some subsequent filings and in the plaintiff's own deposition, however, his surname is spelled "Lantos."  (See, e.g., Def.'s Mot. for Summ. J., filing 14; Def.'s Index, filing 16, Ex. C, Lentos Dep. at 4:14-16.)  Throughout this memorandum, I shall use the spelling that appears in the original complaint.

[2] The facts set forth below have been gleaned from the statements of facts set forth in the parties' briefs, and the evidence is "taken in the light most favorable to the nonmoving party." Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).

for 23 years and has served as the defendant's personnel manager since December 2005. (Def.'s Index, filing 16, Ex. B, Pope Dep. at 5:2-22.) The plaintiff, who is "of Bosnian National Origin," resides in Lincoln, Nebraska. (Complaint, filing 1, Ex. 1, ¶ 1.)

On January 23, 2006, the plaintiff completed an application for employment with the defendant. (Def.'s Index, filing 16, Ex. C, Lentos Dep. at 13:6-14:4.) The plaintiff was "not really" able to read the information on the application, however, and nobody helped him fill it out. (Id. at 14:5-22.) In the "Education and Training" section of the application, the plaintiff wrote only the word "Europa." (Id., Lentos Dep., Ex. C1 at 2.)

On April 19, 2006, the defendant offered the plaintiff a position as a concrete finisher, "subject to a post-offer, pre-employment physical" examination. (Complaint, filing 1, Ex. 1, ¶¶ 5-6.) The primary tasks of a concrete finisher, or "cement mason," are to "[s]mooth and finish surfaces of poured concrete floors, walls, sidewalks, or curbs to specified textures, using hand tools or power tools including floats, trowels, and screeds." (Def.'s Index, filing 16, Ex. A, Pope Aff., Ex. A1; see also id., Ex. A, Pope Aff. ¶¶ 8-9.) Concrete finishers must have the physical ability to "[c]limb and maintain body balance; use hands and arms fully; stand, kneel, bend, crouch, and crawl for long periods, and see well (either naturally or with correction)." (Def.'s Index, filing 16, Ex. A, Pope Aff., Ex. A1.) In addition, an "employee in this position must be capable of exerting in excess of 50 to 100 pounds of force frequently to move objects." (Id.) It is undisputed that a person whose ability to bend and stoop is restricted could not perform the essential functions of a concrete finisher, with or without reasonable accommodations. (See Def.'s Br., filing 15, Statement of Facts ¶ 60; Pl.'s Br., filing 21, Statement of Facts ¶ 31.)[3]

On April 19, 2006, the plaintiff reported to a conference room at the defendant's office and completed an "Employee Information Kit." (See Def.'s Index, filing 16, Ex. C, Lentos Dep. at 31:24-38:10; id., Ex. C, Lentos Dep., Ex. C2; Def.'s Index, filing 16, Ex. B., Pope Dep. at 23:22-24:2.) The plaintiff states, however, that he was "not really" able to read the Employee Information Kit. (Def.'s Index, filing 16, Ex. C, Lentos Dep. at 34:1-7.) Although Pope was present in the room while the plaintiff completed the Employee Information Kit, the plaintiff did

---

[3]Although the plaintiff does not dispute this fact, he objects to its relevance. (See Pl.'s Br., filing 21, Statement of Facts ¶ 31.) This objection is overruled.

2

not ask any questions about it. (Id. at 34:8-24.)

The Employee Information Kit included a document entitled "Equal Employment Opportunity Survey." (Def.'s Index, filing 16, Ex. C, Lentos Dep., Ex. C2 at 3.) On this document, and under the heading "Ethnic Background," the plaintiff marked the box next to the word "White." (Id.)

The Employee Information Kit also included a document entitled "Post Offer Employee Statement." (Def.'s Index, filing 16, Ex. C, Lentos Dep., Ex. C2 at 4.) This document, which was signed by the plaintiff, contains the following language.

> I certify that the information contained herein is correct to the best of my knowledge and understand that any false or misleading statements, as well as incomplete statements, will be sufficient cause for rejection of my employment with the Company. I further agree and understand by providing this information; [sic] the Company is in no way obligated to employ me.
>
> I authorize the Company to investigate all statements contained herein . . . . I agree to furnish any additional information and complete such examinations as may be required or requested by the Company.
>
> . . . .
>
> . . . I understand that if an employment relationship is established, both parties have the right to terminate their employment "at any time for any reason". I also understand that the Company retains the right to terminate my employment at any time.
>
> I hereby acknowledge that I have read and understand the above statement.

(Id.) Pope states that the defendant "strictly" follows its "policy on lying and/or providing false information." (Def.'s Index, filing 16, Ex. A, Pope Aff. ¶ 21.)

A "Post Offer Employment Information" form was also included in the Employee Information Kit. (Def.'s Index, filing 16, Ex. C, Lentos Dep., Ex. C2 at 9.) On this form, the plaintiff answered "NO" to the question, "Have you had a previous injury or accident which would impact your job performance or be aggravated by your assigned duties?" (Id.) He also answered "NO" to the question, "Have you ever filed a workers compensation claim?" (Id.)

Also on April 19, 2006, the plaintiff completed the aforementioned "post-offer, pre-employment" physical examination at Saint Elizabeth Company Care (St. Elizabeth) in Lincoln,

Nebraska. (See Def.'s Index, filing 16, Ex. B, Pope Dep., Exs. B1, B2.) The plaintiff passed this examination, (see id., Ex. B, Pope Dep. at 34:10-14), and St. Elizabeth notified Pope of the results (id., Ex. B, Pope Dep., Ex. B2). The notification received by Pope consisted of a "Nurse Screen A or B Result Form." (Id., Ex. B, Pope Dep., Ex. B2.) On this form, a box appearing next to the statement "Individual meets screen guidelines" is marked with an "X." (Id.) A box appearing next to the statement "Recommend further evaluation by a physician or other health care provider" is not marked. (Id.)

On April 21, 2006, the plaintiff signed a document entitled "Patient Authorization for Disclosure of Protected Health Information." (Def.'s Index, filing 16, Ex. C, Lentos Dep., Ex. C4.) This document authorized St. Elizabeth to release to Pope all of the medical records "generated from" the plaintiff's April 19, 2006, "treatment date." (Id.) Pope provided this document to St. Elizabeth, and it appears that Pope did receive a copy of the relevant records. (See Def.'s Index, Ex. B, Pope Dep. at 39:11-20, 41:7-9.)

At some unspecified time–probably after Pope received the records "generated from" the April 19, 2006, examination–Pope received a phone call from someone at St. Elizabeth. (Def.'s Index, filing 16, Ex. B, Pope Dep. at 35:11-36:1, 42:15-43-13.) The caller told Pope that "they had some additional concerns about [the plaintiff], and they recommended further evaluation or further investigation." (Id. at 36:6-9.)[4] The caller added that "they wanted [Pope]" to get consent from [the plaintiff] to make . . . some additional information available." (Id. at 36:10-15.) It is fair to say that Pope's recollection of this conversation was poor. (See generally id. at 35:11-43:25.) In any event, the plaintiff did sign a second "Patient Authorization for Disclosure of Protected Health Information" form on April 27, 2006. (Def.'s Index, Ex. C, Lentos Dep., Ex. C5.) This document authorized St. Elizabeth to release to Pope "old records thru 2003." (Id.) It appears that the document was provided to St. Elizabeth, and on April 27, 2006, St. Elizabeth faxed to Pope an "Impairment Rating" prepared by Dr. Karen Philips on June 24, 2003. (See Def.'s Index, filing 16, Ex. A, Pope Aff., Ex. A2.) The Impairment Rating states, in pertinent part, as follows.

---

[4]It is not clear whether the word "they" refers to the caller personally, St. Elizabeth generally, or some other person or group at St. Elizabeth.

4

>At the present time, [the plaintiff] reports that he continues to have bilateral constant low back pain with posterior leg pain. . . . He reports that he can walk one to two blocks before having to stop. His pain is worse with bending, lifting, prolonged sitting, and prolonged walking. His pain is improved with lying down, taking Aleve, and utilizing a pillow. . . . He has never returned back to work, since the injury of September 2002. He currently is able to do some shopping for his own groceries, but reports that walking in Wal-Mart is too far and requires him to rest. He reports performing no significant activity, other than some of these home activities.
>
>. . . .
>
>. . . [The plaintiff] does have a significant history of recurrent back pain. In the past, he has been treated for his degenerative disk disease and has previously been given a 5% impairment rating. Subsequently, however, he was able to return back to heavy work and has been working as a concrete finisher. However, at this point, it does appear that his degenerative disk disease is significant enough to continue to keep him away from work. It does appear that his current diagnosis and symptoms are the result of an aggravation of a pre-existing back condition.
>
>. . . .
>
>. . . Based upon my evaluation of [the plaintiff], I would place him at a light physical demand classification indicating that he could lift up to 20 pounds, with avoidance of repetitive bending and stooping.

(Id. at 2-3.)

On or about April 27, 2006, Pope withdrew his offer to employ the plaintiff as a concrete finisher. Pope claims that he withdrew the offer of employment because he concluded that, in light of the information contained in the Impairment Rating, the plaintiff provided false information on the "Post Offer Employment Information Form." (Def.'s Index, filing 16, Ex. B, Pope Dep. at 46:15-47:9, 52:8-22.) Specifically, Pope claims that the plaintiff answered falsely to the questions, "Have you had a previous injury or accident which would impact your job performance or be aggravated by your assigned duties?" and "Have you ever filed a workers compensation claim?" (See id., Ex. B, Pope Dep., Ex. B3 at 1; see also Def.'s Index, filing 16, Ex. C, Lentos Dep., Ex. C2 at 9.) The plaintiff claims that Pope told him that the offer was withdrawn because the plaintiff was disabled. (See Def.'s Index, filing 16, Ex. C, Lentos Dep. at

5

58:3-59:24.) It is undisputed, however, that the plaintiff has had six prior workers' compensation injuries and claims;[5] that the plaintiff has been told by physicians that he has chronic low back pain and degenerative disk disease; and that the plaintiff had been placed on "light duty" status in the past. (See id. at 73:18-74:22; 86:19-94:21; see also id., Ex. C, Lentos Dep. Exs. C11-C13.) Indeed, the plaintiff stated during his deposition that he "believe[d]" he was then restricted to light duty–though he added that he was "okay" and that he wanted "to go back to work." (Def.'s Index, filing 16, Ex. C, Lentos Dep. at 75:5-18.)

The plaintiff also claims that the defendant "chose to hire an [H]ispanic, rather than hiring someone of non-[H]ispanic . . . National Origin." (Complaint, filing 1, Ex. 1, ¶ 12.) During his deposition, the plaintiff stated,

> When . . . [Pope] call me to fill out all the paper, when I go to the office, it was a bunch of Mexican. I'm not a racist; everybody, you know, same thing, like everybody same for me. I'm not a racist. Mexican or Romanian or Hungarian; it's, for me, it's everybody's part.
>
> I knew right away; I knew right away that he no hire me, because that people work for less money, work for seven, eight dollars. Why he have to pay me you know 16, 17 dollars and they pay to the, the Mexicans, you know, no paper, no anything, all under table, all seven, eight dollar an hour; that's why he don't.
>
> I knew right away he don't hire me. I knew why; it was, 100 percent, it was a bunch of, you know, Mexicans, you know.

(Def.'s Index, filing 16, Ex. C, Lentos Dep. at 30:19-31:9.)

It is undisputed that at relevant times, Pope knew that the plaintiff was from Europe, but he did not know that the plaintiff was Bosnian. (Def.'s Index, filing 16, Ex. B, Pope Dep. at 25:12-25.)

## II. STANDARD OF REVIEW

A motion for summary judgment shall be granted by the court when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."

---

[5]I note, however, that there is no evidence that Pope knew of the plaintiff's prior workers' compensation claims when he withdrew his offer to employ the plaintiff.

Fed. R. Civ. P. 56(c). A "material" fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). If the moving party meets the initial burden of establishing the nonexistence of a genuine issue, then the burden shifts to the nonmoving party to produce evidence of the existence of a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment," Anderson, 477 U.S. at 257, and "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial," id. at 256 (citing Fed. R. Civ. P. 56(e)).

### III.    ANALYSIS

The defendant argues that it is entitled to summary judgment on the plaintiff's claims of disability-based discrimination in violation of the ADA and national-origin discrimination in violation of Title VII. The defendant's arguments with respect to each claim will be analyzed separately below.

#### A.    The ADA

The plaintiff alleges that the defendant violated the ADA by discriminating against him on the basis of his disability (or perceived disability) and by subjecting him to an unlawful pre-employment medical inquiry in violation of 42 U.S.C. § 12112(d). (See Compl., filing 1, Ex. 1, ¶¶ 6-11, 13.) Although it seems to me that the plaintiff's claims are quite interdependent, I shall begin by analyzing the plaintiff's discrimination claim.

The ADA prohibits "covered entit[ies]" from discriminating "against a qualified individual with a disability because of the disability . . . in regard to" a number of actions, including "job application procedures" and "hiring." 42 U.S.C. § 12112(a). To avoid summary judgment on his ADA claim, the plaintiff may present either direct or inferential evidence of discrimination. See, e.g., Libel v. Adventure Lands of America, Inc., 482 F.3d 1028, 1034 (8th

Cir. 2007). In this case, the plaintiff has not argued that there is direct evidence of discrimination. Instead, he seeks to avoid summary judgment by creating an inference of discrimination under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). See, e.g., Libel, 482 F.3d at 1034. Under this framework, a plaintiff must first establish a prima facie case by showing: (1) that he is disabled within the meaning of the ADA; (2) that he is qualified to perform the essential functions of his position with or without a reasonable accommodation; and (3) that he suffered an adverse employment action because of his disability. See, e.g., Epps v. City of Pine Lawn, 353 F.3d 588, 591 (8th Cir. 2003). "The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employer's actions." Libel, 482 F.3d at 1034. "If the employer articulates such a reason, the burden returns to the employee to show the employer's justification is a pretext." Id.

The defendant argues first that it is entitled to summary judgment because the plaintiff cannot establish that he is qualified to perform the essential functions of a concrete finisher with or without accommodation. (Def.'s Br., filing 15, at 14-18.) See also Epps, 353 F.3d at 592 ("Summary judgment is proper if a plaintiff fails to establish any element of his prima facie case.").[6] "Although [the plaintiff] retains the ultimate burden of proving that he is a qualified individual, an employer who disputes his claim that he can perform the essential functions of the job must put forth evidence establishing those functions." Dropinski v. Douglas County, Nebraska, 298 F.3d 704, 707 (8th Cir. 2002) (citation omitted). The essential functions of a job can be established by the following evidence:

> (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs.

Id. (citation omitted).

The defendant has submitted evidence that concrete finishers are required to "[s]mooth

---

[6] I note in passing that the defendant has not argued that the plaintiff cannot establish element one of a prima facie case (i.e., that the plaintiff was disabled within the meaning of the ADA). I assume, therefore, that there is a genuine issue with respect to this element.

and finish surfaces of poured concrete floors, walls, sidewalks, or curbs to specified textures, using hand tools or power tools including floats, trowels, and screeds." (Def.'s Index, filing 16, Ex. A, Pope Aff., Ex. A1.) To perform these tasks, a concrete finisher must be able to climb and balance; he must be able to stand, kneel, bend, crouch, and crawl for long periods; and he must be capable of exerting 50 to 100 pounds of force frequently. (Id.) As this evidence is undisputed, I find that the defendant has satisfied its burden of establishing the essential functions of a concrete finisher.

I must now determine if there is a genuine issue as to whether the plaintiff is capable of performing these essential functions with or without a reasonable accommodation. In support of its argument that the plaintiff lacks this capability, the defendant relies upon the Impairment Rating prepared by Dr. Phillips on June 24, 2003. (See Def.'s Br., filing 15, at 17-18.) As noted above, Dr. Phillips concluded that the plaintiff's degenerative disk disease was "significant enough to continue to keep him away from work" and that the plaintiff should be placed "at a light physical demand classification," which meant "that he could lift up to 20 pounds . . . with avoidance of repetitive bending and stooping." (Def.'s Index, filing 16, Ex. A, Pope Aff., Ex. A2 at 3.) The defendant argues, "Based on these physical limitations and the essential functions described [above], there is no question that [the plaintiff] would be unable to perform the essential functions of a concrete finisher." (Def.'s Br., filing 15, at 18.) I am not persuaded. Dr. Phillips' June 2003 impairment rating does not establish that the plaintiff was incapable of performing the essential functions of a concrete finisher in April 2006 (when the defendant withdrew its offer to employ the plaintiff). See, e.g., EEOC v. Wal-Mart Stores, Inc., 477 F.3d 561, 568 (8th Cir. 2007) ("The determination of whether an individual is qualified for purposes of the ADA . . . should be made as of the time of the employment decision." (quoting Browning v. Liberty Mut. Ins. Co., 178 F.3d 1043, 1047 (8th Cir. 1999))). Similarly, although there is some evidence that the plaintiff was restricted to light duty at the time of his June 20, 2007, deposition, (see Def.'s Index, filing 16, Ex. C, Lentos Dep. at 75:5-18), the evidence does not establish that the plaintiff was restricted to light duty at the relevant time. On the contrary, evidence that the plaintiff passed the post-offer, pre-employment physical examination on April 19, 2006, might support a finding that the plaintiff was capable of performing the essential

functions of the job in April 2006. I must therefore reject the defendant's argument that the plaintiff cannot satisfy element two of his prima facie case under the McDonnell Douglas framework.

The defendant argues next that summary judgment is proper because the plaintiff cannot establish that he suffered an adverse employment action because of his disability. (Def.'s Br., filing 15, at 18-20.) More specifically, the defendant argues that the plaintiff "was terminated not because of an existing or perceived disability, but . . . rather . . . because he provided false information in his 'Employee Information Kit.'" (Id. at 18.) It is true that the plaintiff answered "NO" to the question, "Have you had a previous injury or accident which would impact your job performance or be aggravated by your assigned duties?" despite evidence that he had an injury that affected his "job performance" in 2003. (See Def.'s Index, filing 16, Ex. A, Pope Aff., Ex. A2; Def.'s Index, filing 16, Ex. C, Lentos Dep. at 73:18-74:22; id., Ex. C, Lentos Dep., Ex. C2 at 9.) It is also undisputed that the plaintiff falsely answered "NO" to the question, "Have you ever filed a workers compensation claim?" (Def.'s Index, filing 16, Ex. C, Lentos Dep. at 86:19-94:21; id., Ex. C, Lentos Dep., Ex. C2 at 9.) Nevertheless, "the threshold of proof necessary to establish a prima facie case is minimal," Young v. Warner-Jenkinson Co., Inc., 152 F.3d 1018, 1022 (8th Cir. 1998), and it seems to me that the plaintiff's evidence satisfies this threshold. Specifically, the plaintiff claims that Pope told him that the offer of employment was withdrawn because of the plaintiff's past "work accident" and because he was disabled. (See Def.'s Index, filing 16, Ex. C, Lentos Dep. at 58:3-59:24.) I find that this evidence is sufficient to raise an inference of discrimination. Cf. Young, 152 F.3d at 1022 (holding that evidence indicating that the defendant offered a different explanation at the time of the plaintiff's dismissal was enough to support an inference of discrimination).

Because the defendant has not shown that the plaintiff cannot establish a prima facie case of discrimination, the burden shifts to the defendant to articulate one or more legitimate, nondiscriminatory reasons for its refusal to employ the plaintiff. E.g., Libel v. Adventure Lands of America, Inc., 482 F.3d 1028, 1034 (8th Cir. 2007); Young, 152 F.3d at 1022. The defendant argues that the plaintiff's false responses to questions posed in the Employee Information Kit amount to such a reason. (Def.'s Br., filing 15, at 19.) I agree. Pope withdrew the offer to

employ the plaintiff after reviewing the Impairment Rating prepared by Dr. Phillips and concluding that, contrary to the plaintiff's representations on his "Post Offer Employment Information" form, the plaintiff had suffered a past work-related injury that would be aggravated by his duties as a concrete finisher. (See, e.g., Def.'s Index, filing 16, Ex. B, Pope Dep. at 46:15-47:9, 48:7-8; 50:2-52:17; id., Ex. C, Lentos Dep., Ex. C2 at 9.) Although the 2003 Impairment Rating does not establish that the plaintiff was unable to perform the functions of a concrete finisher in April 2006, and although it is doubtful that the Impairment Rating actually establishes that the plaintiff "had a previous injury or accident which would impact [his] job performance or be aggravated by [his] assigned duties" in 2006, (see Def.'s Index, filing 16, Ex. C, Lentos Dep., Ex. C2 at 9 (emphasis added)), the proper inquiry here is not whether Pope was factually correct that the plaintiff answered this question falsely, but whether he "honestly believed" that the plaintiff answered this question falsely, see, e.g., Mershon v. St. Louis University, 442 F.3d 1069, 1075 (8th Cir. 2006) (citing Johnson v. AT & T Corp., 422 F.3d 756, 762 (8th Cir. 2005)). There is no indication that Pope did not honestly believe that the plaintiff's answer was false (though the plaintiff does dispute whether this was the real reason behind the withdrawal of the job offer). In addition, the defendant has submitted undisputed evidence that it considered misrepresentations on the employment forms to be "sufficient cause for rejection of . . . employment with the Company." (Def.'s Index, filing 16, Ex. C, Lentos Dep., Ex. C2 at 4; see also id., Ex. A, Pope Aff. ¶¶ 19-21.) I therefore find that the defendant has satisfied its burden of coming forward with a legitimate, nondiscriminatory reason for its decision to withdraw the employment offer.[7]

---

[7] The defendant also submits an "after-acquired evidence defense" based upon the plaintiff's false representation that he had never filed a workers' compensation claim. (See Def.'s Br., filing 15, at 19-20.) There is no evidence that Pope was aware of this misrepresentation when he withdrew the offer to employ the plaintiff. Nevertheless, "[a]n employer is entitled to assert an after-acquired evidence defense if during the course of litigation it learns of something that, had it know[n] the information earlier, would have justified terminating the employee anyway." Olson v. International Business Machines, No. Civ. 05-118 MJD/AJB, 2006 WL 503291, at * 17 (D. Minn. March 1, 2006). To establish this defense, the defendant must show that the plaintiff's "wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 362-63 (1995).

The burden now shifts to the plaintiff to demonstrate that the defendant's stated reasons for withdrawing the employment offer "were but pretext for unlawful discrimination." Young, 152 F.3d at 1022.

> [T]he rule in this Circuit is that [a discrimination] plaintiff can avoid summary judgment only if the evidence considered in its entirety (1) creates a fact issue as to whether the employer's proffered reasons are pretextual and (2) creates a reasonable inference that [the plaintiff's disability] was a determinative factor in the adverse employment decision. The second part of this test sometimes may be satisfied without additional evidence where the overall strength of the prima facie case and the evidence of pretext "suffice[s] to show intentional discrimination." The focus, however, always remains on the ultimate question of law: whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of the plaintiff's [disability].

Young, 152 F.3d at 1022-23 (alterations in original) (citation omitted).

The plaintiff does not argue specifically that the defendant's reason for withdrawing the offer of employment was a pretext for discrimination in violation of the ADA. (See Pl.'s Br., filing 21, at 12-17.) Instead, relying heavily upon Garrison v. Baker Hughes Oilfield Operations, Inc., 287 F.3d 955 (10th Cir. 2002), he argues that the defendant's inquiry into his 2003 medical

---

When evaluating the evidence submitted in support of the defense, "[t]he court must look to the employer's actual employment practices and not merely the standards articulated in its employment manuals, for things are often observed in the breach but not in the keeping." Sellers v. Mineta, 358 F.3d 1058, 1064 (8th Cir. 2004).

The defendant has submitted evidence that the plaintiff's "acts were of such a severity as to cause termination" and that the defendant "strictly followed its policy on lying and/or providing false information." (Def.'s Index, filing 16, Ex. A., Pope Aff. ¶¶ 20-21.) For the purposes of this memorandum, I shall assume that the defendant's evidence–which is undisputed–is sufficient to establish the after-acquired evidence defense. The after-acquired evidence defense does not provide a complete defense to liability, however. See generally McKennon v. Nashville Banner Pub. Co., 513 U.S. 352 (1995). If a plaintiff is able to establish that he was a victim of unlawful discrimination, the after-acquired evidence defense merely serves to limit the plaintiff's eligibility for certain remedies. See id.; see also Red Deer v. Cherokee County, Iowa, 183 F.R.D. 642, 647 (N.D. Iowa 1999). Therefore, I am not persuaded that the defendant can obtain a full summary judgment on the plaintiff's ADA claim based upon its after-acquired evidence theory–as the defendant seems to suggest in its brief. (See Def.'s Br., filing 15, at 19-20.)

records violated 42 U.S.C. § 12112(d)(3)(A), and that the defendant used those records to discriminate against him on the basis of a perceived disability in violation of 42 U.S.C. § 12112(d)(3)(C). (See id. at 15-17.) I shall consider the particular merits of each of these arguments before considering their relationship to the question of pretext.

Section 12112(d)(3) provides that "[a] covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if–(A) all entering employees are subjected to such an examination regardless of disability; . . . and (C) the results of such examination are used only in accordance with this subchapter." The plaintiff argues that subsection (A) has been violated because, although "all employees were subjected to the physical examination," only the plaintiff "was subjected to the further requirement of releasing his record[s] back to 2003." (Pl.'s Br., filing 21, at 15.) See also 42 U.S.C. § 12112(d)(3)(A); 29 C.F.R. § 1630.14(b) ("A covered entity may require a medical examination (and/or inquiry) after making an offer of employment to a job applicant and before the applicant begins his or her employment duties, and may condition an offer of employment on the results of such examination (and/or inquiry), if all entering employees in the same job category are subjected to such an examination (and/or inquiry) regardless of disability."). The plaintiff's suggestion that no other prospective employee has been required to release past medical records is unsupported. Nevertheless, the evidence now before me–including Pope's poorly-recalled account of the events that preceded his requests for additional medical records–does suggest that the plaintiff was made to submit to an unusual, if not unique, inquiry. Indeed, the plaintiff was asked to sign two separate release forms despite the fact that he passed the defendant's physical examination and despite the fact that the medical examiner did not indicate that any further evaluation was necessary. Also, it is at least arguable that the offer of employment was "conditioned" on the results of the records inquiries. Therefore, it seems to me that there is a genuine issue as to whether the defendant violated 42 U.S.C. § 12112(d)(3)(A).[8] Nevertheless, I fail to see how the existence of a viable claim based

---

[8] I note parenthetically that the plaintiff must also establish that the defendant's violation of § 12112(d)(3)(A) "caused some sort of tangible injury." Cossette v. Minnesota Power &

13

on § 12112(d)(3)(A) establishes that the defendant's nondiscriminatory reason for refusing to employ the plaintiff is a pretext for unlawful discrimination. In other words, the fact that the defendant may have violated § 12112(d)(3)(A) when it inquired into the plaintiff's medical history does not seem to raise a genuine issue as to whether the defendant truly withdrew the employment offer because of the plaintiff's misrepresentations.

In contrast, it seems to me that the question whether the defendant violated § 12112(d)(3)(C) is interconnected with the question of pretext. The Tenth Circuit's opinion in Garrison illustrates this interconnection. In that case, Plaintiff Garrison applied for an assembly job in the defendant's manufacturing plant, and the defendant made an offer of employment conditioned on the results of a medical examination. As a part of this examination, Garrison was required to complete a medical history form that asked whether he "had ever suffered: hearing loss; pain in the shoulder, arms, or hands; leg or foot problems; and back pain, strain, or surgery." 287 F.3d at 958. Garrison falsely answered "no" to each of these questions. He passed the medical examination, however, and he was recommended for the position. Thereafter, the defendant forwarded Garrison's medical history form to its human resources department, which obtained Garrison's past workers' compensation records and discovered that Garrison "had suffered injuries to his hearing, neck, shoulder, elbow, hand, back, abdomen, lungs, knee, and feet." Id. The defendant then withdrew its offer to employ Garrison. When Garrison inquired about the defendant's withdrawal of the offer, the defendant's manager of human resources responded, "So when we look at those kind of histories, we look at those in terms of where we are placing people for possible future injuries." Id. He added, "Well, the positions that we were looking at you for are those positions that would put you in a position to likely be injured again and we don't do that." Id. The jury received a "mixed motive" instruction at trial, and it found

---

Light, 188 F.3d 964, 970 (8th Cir. 1999). The defendant argues that the plaintiff cannot show that he was damaged by the examination because it is undisputed that the plaintiff passed the examination. (See Def.'s Br., filing 15, at 24.) It is also undisputed, however, that the defendant withdrew its offer to employ the plaintiff "based on" the Impairment Rating that it received from St. Elizabeth. (See, e.g., Def.'s Index, filing 16, Ex. B, Pope Dep. at 52:13-22.) Thus, it seems to me that a reasonable jury could conclude that the defendant's inquiry into the plaintiff's medical history did indeed cause a "tangible injury."

14

that the defendant "withdrew its job offer in part for legitimate reasons." Id. The jury also found, however, that the defendant would have employed Garrison "but for motives not job-related and inconsistent with business necessity," and it awarded compensatory damages to Garrison. Id.

On appeal, the defendant argued that "it complied with § 12112(d)(3) by similarly examining all entering employees, keeping exam results confidential, and using exam results only in accordance with the [ADA]." 287 F.3d. at 959. The defendant also argued that "it withdrew Mr. Garrison's job offer because of false answers on his medical questionnaire, rather than because of a disability or perceived disability." Id. In addressing the defendant's arguments, the Tenth Circuit first summarized the requirements of § 12112(d)(3)(C), stating,

> Under § 12112(d)(3)(C), an employer's reasons for withdrawing a conditional job offer must be "job related and consistent with business necessity." 29 C.F.R. § 1630.14(b)(3). Moreover, the employer may only withdraw the conditional job offer if "performance of the essential job functions cannot be accomplished with reasonable accommodation."

287 F.3d at 960. More specifically, the court explained that "[t]he results of a medical inquiry or examination may not be used to disqualify persons who are currently able to perform the essential functions of a job, either with or without an accommodation, because of fear or speculation that a disability may indicate a greater risk of future injury, absenteeism, or may cause future workers' compensation or insurance costs." Id. (quoting Equal Employment Opportunity Commission, Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act § 6.4 (1992)) (emphasis omitted). The court then rejected the defendant's arguments, stating,

> The record on appeal shows substantial evidence [the defendant] misused Mr. Garrison's entrance examination results. Mr. Brown, [the defendant's manager of human resources], told Mr. Garrison his offer was revoked because of a risk of "possible future injuries," and because "we don't do that." Moreover, at trial when asked what concerned him about Mr. Garrison's examination results, Mr. Brown explained "it was just the multitude of injuries in a short period of time." Under these circumstances, the jury could have determined [the defendant] withdrew the job offer because of unsubstantiated speculation about future risks from a perceived disability. While Mr. Garrison admitted he falsely represented his medical history, it was within the province of the jury to ascribe withdrawal of the job offer to discriminatory use of medical exam results. Because substantial

15

evidence supports this jury verdict, we leave it undisturbed.

287 F.3d at 960-61 (footnotes omitted). The court also addressed specifically the amici curiae's argument that "the district court opinion jeopardizes employers' 'lawful right to refuse to hire a person who knowingly provides a false answer in a post-offer inquiry.'" Id. at 961 n.5. Citing section 9.8 of the Equal Employment Opportunity Commission's Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act (1992), which provides, "An employer may refuse to hire . . . a person who knowingly provides a false answer to a lawful post-offer inquiry about his/her condition or workers' compensation history," the court acknowledged that the ADA does not forbid "withdrawing conditional job offers from entering employees who lie on medical questionnaires." Id. The court explained, however, that "sufficient evidence existed in this case of an alternative discriminatory motive to sustain a jury verdict in favor of [the plaintiff]." Id.

In the case now before me, the question at hand is not whether sufficient evidence exists to support a jury finding that the defendant acted with a discriminatory motive, but "whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of the plaintiff's [disability]." Young v. Warner-Jenkinson Co., Inc., 152 F.3d 1018, 1023 (8th Cir. 1998). In other relevant respects, however, Garrison's discussion of the importance of evidence of a discriminatory motive is instructive. In the instant case, as in Garrison, the defendant argues that it refused to hire the plaintiff on the ground that he answered falsely to a lawful, post-offer inquiry about his medical history. According to the court's analysis in Garrison, which I find to be persuasive, it seems to me that the defendant is entitled to summary judgment on the plaintiff's § 12122(d)(3)(C) claim unless the evidence creates a reasonable inference that the plaintiff's disability (or perceived disability) was a determinative factor in the defendant's decision to withdraw the offer. Furthermore, if the evidence cannot support such an inference, it necessarily follows that the plaintiff cannot establish that the defendant's asserted reasons for withdrawing the job offer were pretexts for unlawful discrimination. In other words, if the evidence does not create a fact issue as to whether the defendant's proffered reasons are pretextual, the defendant is entitled to summary judgment on the plaintiff's claim that the defendant discriminated against him on the basis of his disability

16

or perceived disability and on the plaintiff's § 12112(d)(3)(C) claim.

In Garrison, there was evidence that the defendant withdrew the offer not solely because of Garrison's false representations, but also because of "unsubstantiated speculation about future risks from a perceived disability." 287 F.3d at 960. This amounted to a misuse of the examination results. In the instant case, the plaintiff has established that there are genuine issues as to whether the defendant's inquiry into the plaintiff's 2003 medical records violated § 12112(d)(3)(A) and as to whether he was capable of performing the concrete finisher position in April 2006. He has also submitted evidence that Pope told him that the employment offer was withdrawn because of the plaintiff's past injuries and because he believed the plaintiff to be disabled. (See Def.'s Index, filing 16, Ex. C, Lentos Dep. at 58:3-59:24.) I cannot say that no reasonable trier of fact could credit the plaintiff's evidence. Therefore, there are genuine issues as to whether the defendant's reasons for withdrawing the job offer were pretexts for discrimination in violation of the ADA and as to whether the defendant misused the results of its inquiry into the plaintiff's medical records in violation of § 12112(d)(3)(C).

For the foregoing reasons, the defendant's motion for summary judgment on the plaintiff's ADA claims must be denied.

### B.     Title VII

The defendant has also moved for summary judgment on the plaintiff's claim that the defendant discriminated against him on the basis of his national origin. This motion will be granted.

Although the plaintiff has not presented direct evidence of discrimination, he can avoid summary judgment on his Title VII claim by creating an inference of unlawful discrimination through the McDonnell Douglas framework outlined above. See, e.g., Arraleh v. County of Ramsey, 461 F.3d 967, 974-75 (8th Cir. 2006); Habib v. NationsBank, 279 F.3d 563, 566 (8th Cir. 2001). (See also supra Part III.A.) To establish a prima facie case based on "failure to hire," the plaintiff must prove that "(1) he is a member of a protected class; (2) he was qualified for the position for which the employer was accepting applications; (3) he was denied the position; and (4) the employer hired someone from outside the protected class." Arraleh, 461 F.3d at 975. The

third and fourth elements of the prima facie case are sometimes framed more generally: If a plaintiff can establish that she suffered an adverse employment action under circumstances that permit an inference of unlawful discrimination, the fourth element will be deemed satisfied. E.g., Habib, 279 F.3d at 566.

The defendant argues first that the plaintiff cannot establish the second element of a prima facie case. (See Def.'s Br., filing 15, at 22.) For the reasons explained above, (see supra Part III.A), I find that there is a genuine issue as to whether the plaintiff was capable of performing the essential functions of a concrete finisher. I must therefore reject the defendant's argument.[9]

Next, the defendant argues that the plaintiff cannot establish that the facts surrounding the withdrawal of the employment offer give rise to an inference of unlawful discrimination based on national origin. (See Def.'s Br., filing 15, at 23.) I agree. The only evidence offered by the plaintiff in support of his Title VII claim is that a "bunch" of people that he described as "Mexican" were present at the defendant's office when the plaintiff came to fill out paperwork. (Def.'s Index, filing 16, Ex. C, Lentos Dep. at 30:19-31:9.) The plaintiff claims that upon seeing these people, he "knew right away" that he would not be hired because he believed that the "Mexicans" would work for less money "under the table." (See id.) The plaintiff's "evidence" is entirely speculative, however; indeed, despite the plaintiff's statement that he is "not a racist," his testimony appears to be based on nothing more than race-based stereotypes. The plaintiff's speculation and conjecture about the defendant's motives in refusing to hire him are insufficient to permit a finding in his favor at trial. See, e.g., Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994) ("In order to withstand the motion for summary judgment, Moody must substantiate his allegations with 'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'"). Therefore, I find that the defendant is entitled to summary judgment on the plaintiff's Title VII claim.

---

[9] The defendant argues that in order to establish the second element of a prima facie case, the plaintiff must show that he was meeting the defendant's "legitimate expectations" at the time of the adverse employment action. (See Def.'s Br., filing 15, at 21-22.) While this formulation of element two may be useful in discriminatory discharge claims, see, e.g., Ghane v. West, 148 F.3d 979, 981 (8th Cir. 1998), it is not logical to apply it in a failure-to-hire context.

**IT IS ORDERED** that:

1.  The defendant is entitled to summary judgment on the plaintiff's claim of discrimination based upon national origin; and

2.  The defendant's motion for summary judgment, filing 14, is otherwise denied.

Dated November 7, 2007.

                BY THE COURT

                s/ Warren K. Urbom
                United States Senior District Judge