IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JOSIF LANTOS,<br><br>   Plaintiff,<br><br>v.<br><br>HAWKINS CONSTRUCTION COMPANY,<br><br>   Defendant. | Case No. 4:07-CV-03045-WKU-DLP<br><br><br>**HAWKINS CONSTRUCTION COMPANY'S<br>TRIAL BRIEF** |

Hawkins Construction Company ("Hawkins"), by and through counsel and for its Trial Brief, respectfully states as follows:

### I.  INTRODUCTION

Josif Lantos ("Lantos") alleges that he was discharged by Hawkins because Hawkins perceived Lantos to be disabled and acted in violation of the Americans with Disabilities Act, 42 U.S.C. § 12111 *et seq.* (the "ADA").  Lantos also alleges that Hawkins violated the ADA by requesting additional medical records during a post-offer, pre-employment physical examination.

At trial, Hawkins will show that Lantos's ADA claims fail because Lantos is not qualified to perform the essential functions of a concrete finisher position, with or without accommodation. Lantos's ADA claims also fail because Hawkins terminated Lantos, not because of any perceived or actual disability but, rather, because he provided Hawkins false information in his "Employee Information Kit".

Finally, Plaintiff will be unable to establish that any physical examination or any request for medical information was improper.

## II.  ARGUMENT AND AUTHORITY

Lantos's ADA claim is simply without merit.  To establish a prima facia case of employment discrimination under the ADA, Lantos must prove (1) that he has a disability or is perceived to have a disability within the meaning of the ADA, (2) that he is qualified to perform the essential functions of the job, with or without accommodation, and (3) that he suffered an adverse employment action because of his disability or perceived disability.  *See Epps v. The City of Pine Lawn,* 353 F.3d 588, 591 (8th Cir. 2003); *see also Cravens v. Blue Cross & Blue Shield of Kansas City,* 214 F.3d 1011, 1016 (8th Cir. 2000).

Plaintiff Lantos is unable to establish that (1) he is qualified to perform the essential functions of a concrete finisher at Hawkins Construction Company with or without accommodation and (2) he suffered an adverse employment action *because* of his disability.  *See Laurin v. The Providence Hosp. and Mass. Nurses Ass'n.,* 150 F.3d 52, 58-59 (1st Cir. 1998) (stating that "an ADA plaintiff ultimately must shoulder the burden of establishing that she was able to perform all 'essential functions' of her position").

**A.  Lantos cannot perform the essential functions of a concrete finisher at Hawkins with or without an accommodation.**

The second element Lantos must prove to establish a prima facia case of employment discrimination under the ADA is that he is qualified to perform the essential functions of the job, with or without accommodation.  *See* 42 U.S.C. § 12111(8).  Lantos will be unable to make this showing at trial.  Lantos will testify that he is currently under restrictions of light duty.  Moreover, the evidence at trial will show that, in July of 2003, Lantos was restricted to "light physical duty" with instructions to avoid lifting in excess of 20 pounds and to avoid "repetitive bending and stooping."

Hawkins' employees will testify that the job of concrete finisher requires an employee to exert "in excess of 40 to 100 pounds of force frequently to move objects." Additionally, an average day for a concrete finisher involves kneeling or bending 75 percent of the day. Indeed, Lantos cannot perform these tasks without an accommodation. Although there is no precise test for determining what is and what is not a reasonable accommodation, it is fair to state that an accommodation is unreasonable if it imposes undue financial burdens, undue administrative burdens or an undue hardship on the operation of the employer's business. *See* 42 U.S.C. § 12112(b)(5)(A); *see also Buckles v. First Data Resources, Inc.,* 176 F.3d 1098, 1101 (8th Cir. 1999). Here, any accommodation would cause all three. Plaintiff's limitations prevent him from engaging in 75% of that position's work. In this instance, Lantos will be unable to establish that a reasonable accommodation is possible as any accommodation would require Hawkins to eliminate 75% of the position's essential functions. To require Hawkins to make such an accommodation would result in a complete restructuring of the concrete finisher position. Although job restructuring is a possible accommodation under the ADA, an employer "need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee." *See Dropinski v. Douglas County, Neb.,* 298 F.3d 704, 709 (8th Cir. 2002) (citing *Fjellestad v. Pizza Hut of Am., Inc.,* 188 F.3d 944, 950 (8th Cir. 1999)). Considering Lantos's medical restrictions, Hawkins would be required to do just that - eliminate the essential functions of his job and reassign existing workers to either assist or complete Lantos's essential duties - a measure not required by the ADA *Id.* The ADA does not require an employer to create a new position to accommodate a disabled employee or to shift the essential functions of a position to other employees. *See Fjellestad,* 188 F.3d at 948; *see also Treanor v. MCI Telecommunications Corp.,* 200 F.23d 570, 575 (8th Cir. 2000) (quoting *Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1112-13 (8th Cir. 1995)) (finding that "restructuring frequently involves

3

reallocating the marginal functions of a job,' [but] an employer is not required to reallocate the essential functions of a job").

### 1. The essential functions of a concrete finisher at Hawkins.

The following evidence may be considered when determining what the essential functions of a parts person include:

> (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs.

*Dropinski v. Douglas County, Neb.,* 298 F.3d 704, 707 (8th Cir. 2002) (citing *Heaser v. The Toro Co.,* 247 F.3d 826, 831 (8th Cir. 2001)); *see also* 29 C.F.R. § 1630.2(n)(3). At trial, Hawkins will introduce evidence concerning (1) its own determination as to which functions are essential; (2) a written job description; and (3) the amount of time spent on the job performing the functions. Each of these sources will show that the essential functions of a concrete finisher at Hawkins include, but are not limited to, the following:

    a. spread concrete to specified depth and workable consistency, using float to bring water to surface and produce soft topping;

    b. level, smooth, and shape surfaces or freshly poured concrete, using straight-edge and float or power screed;

    c. finish concrete surfaces, using power trowel, or wet and rub concrete with abrasive stone to impart finish;

    d. remove rough or defective spots from concrete surfaces, using power grinder or chisel and hammer and patch holes with fresh concrete or epoxy compound;

    e. mold expansion joints and edges, using edging tools, jointers, and straight edge;

    f.    may sprinkle colored stone chips, powdered steel, or coloring powerder on concrete to produce prescribed finish;

    g.    May produce rough concrete surface, using broom;

    h.    may mix cement, using hoe or concrete-mixing machine;

    i.    may level subgrade to fine grade specification using a shovel or motorized equipment;

    j.    saw lumber to blueprint dimensions, using hand saw or power tools and nails lumber together; may also include removal of same material;

    k.    may specialize in finishing steps and stairways;

    l.    may break up and repair old concrete surfaces, using pneumatic tools;

    m.    carry shovels of concrete to fix imperfections in the concrete surface;

    n.    pouring concrete from a truck or pump;

    o.    grading rock or dirt to prepare the surface for concrete;

    p.    setting metal forms to hold the concrete; and

    q.    driving of steel pins into the ground with a sledge hammer to secure concrete forms.

*See* Joint Exhibit 16, p. 2. Additionally, it will be shown that the position of "concrete finisher" has the following physical requirements:

> Climb and maintain body balance; use hands and arms fully; stand, kneel, bend, crouch, and crawl for long periods, and see well (either naturally or with correction). The employee in this position must be capable of exerting in excess of 50 to 100 pounds of force frequently to move objects.

*See* Joint Exhibit 16, p. 2. The evidence will establish that approximately 75% of a concrete finisher's day involves kneeling or bending and 25% involves standing. Moreover, approximately 75% of a concrete finisher's day involves smoothing and finishing concrete while 25% involves set up tasks including grading rock or dirt to prepare the surface for concrete, setting metal forms to

5

hold the concrete, and driving of steel pins into the ground with a sledge hammer to secure concrete forms.

### 2. Lantos's medical limitations prohibit him from performing the essential functions of a concrete finisher.

Once the fact finder determines the essential functions of a concrete finisher at Hawkins, it must then be determined whether Lantos is able to engage in those activities with or without an accommodation. Plaintiff's medical restrictions are important in this regard. Here, medical limitations have been placed on Lantos by Dr. Karen Phillips of Saint Elizabeth Company Care. In the report provided to Mark Pope, "[Lantos's] degenerative disk disease is significant enough to continue to keep him away from work." Moreover, based on Dr. Phillips's evaluation of Lantos, he was placed "at a light physical demand classification indicating that he could lift up to 20 pounds, with avoidance of repetitive bending and stooping." Based on these physical limitations and the essential functions described in section II.A.1, there is no question that Lantos is unable to perform the essential functions of a concrete finisher.

## B. Lantos did not suffer an adverse employment action *because* of his disability or any perceived disability.

Hawkins will introduce evidence showing that Lantos was terminated not because of an existing or perceived disability but, rather, because he provided false information in his "Employee Information Kit." On the "Post Offer Employment Information" form, Lantos answered "NO" to the following two questions:

1. Have you had a previous injury or accident which would impact your job performance or be aggravated by your assigned duties? (If yes, explain.)"

2. "Have you ever filed a workers compensation claim? (If yes, explain.)"

*See* Joint Exhibit 2, p. 9.  At trial, Hawkins will prove that Plaintiff provided inaccurate answers when he responded with "No" to both of these questions.  Mark Pope became aware of these inaccuracies on April 27, 2006 when Saint Elizabeth Company Care faxed him a June 24, 2003 "Impairment Rating."  The "Impairment Rating" reads, in pertinent part, as follows:

> [Lantos] reports that he can walk one to two blocks before having to stop.  ***His pain is worse with bending, lifting, prolonged sitting, and prolonged walking***.  His pain is improved with lying down, taking Aleve, and utilizing a pillow . . . ***He has never returned back to work, since the injury of September 2002.***  He currently is able to do some shopping for his own groceries, but reports that walking in Wal-Mart is too far and requires him to rest.  He reports performing no significant activity, other than some of these home activities.

*See* Joint Exhibit 17, p. 2.  It goes on to read:

> ***Mr. Lantos does have a significant history of recurrent back pain.***  In the past, he has been treated for his degenerative disk disease and has previously been given a 5% impairment rating.  Subsequently, however, he was able to return back to heavy work and has been working as a concrete finisher.  However, at this point, ***it does appear that his degenerative disk disease is significant enough to continue to keep him away from work***.  It does appear that his current diagnosis and symptoms are the result of an aggravation of a pre-existing back condition. . . . Based on my evaluation of Mr. Lantos, ***I would place him at a light physical demand classification indicating that he could lift up to 20 pounds, with avoidance of repetitive bending and stooping***.

*See* Joint Exhibit 17, p. 3.  Relying on the "Impairment Rating", Mr. Pope determined that Lantos provided false information in his "Employee Information Kit".  Thereafter, Mr. Pope informed Lantos that he no longer had the concrete finisher position for Hawkins.  Hawkins Construction Company will show that Mr. Pope had this non-discriminatory reason for terminating Lantos's employment.

It is Hawkins' policy that applicants are not offered positions if false information is provided in their employment paperwork.  Hawkins requires everyone to sign a "Post Offer Employee Statement" at the time he or she completes the "Employee Information Kit."  This statement reads

7

in pertinent part as follows:

> I certify that the information contained herein is correct to the best of my knowledge and understand that ***any false or misleading statements, as well as incomplete statements, will be sufficient cause for rejection of my employment with the Company***. I further agree and understand by providing this information; the Company is in no way obligated to employ me.
>
> * * *
>
> I understand that if an employment relationship is established, both parties have the right to terminate their employment "at any time for any reason". I also understand that the Company retains the right to terminate my employment at any time.

*See* Joint Exhibit 2, p. 4. Lantos acknowledged this policy by signing the "Post Offer Employee Statement" on April 17, 2006. It will be shown that Hawkins strictly followed this policy in April, 2006 and continues to strictly follow this policy today. Indeed, the policy was implemented in the present case. It is undisputed that Mark Pope terminated Lantos's employment immediately after he determined that Lantos provided false or misleading information in his "Employee Information Kit."

    C.    **Lantos's Physical Examination Did Not Violate the ADA.**

At trial, it will be shown that Lantos completed a post-offer, pre-employment physical examination at Saint Elizabeth Company Care on April 19, 2006. *See* Joint Exhibit 15. At or about the same time that Mr. Pope was notified of the passed post-offer, pre-employment examination results, a nurse from Company Care contacted Mr. Pope and suggested that he obtain a medical authorization from Lantos. Mr. Pope will testify that he followed the nurse's suggestion and obtained an authorization for the disclosure of protected health information from Lantos and provided it to Saint Elizabeth Company Care. *See* Joint Exhibit 4. Shortly thereafter, the nurse contacted Mark Pope again and told him that "they had some additional concerns about Mr. Lantos,

8

and they recommended further evaluation or further investigation." Pursuant to the nurses suggestion, Mr. Pope had Mr. Lantos sign a broader authorization and, subsequently, provided it to Saint Elizabeth Company Care. *See* Joint Exhibit 5. At this time, Company Care provided Mr. Pope with a June 24, 2003 "Impairment Rating" prepared by Dr. Karen Phillips. *See* Joint Exhibit 17.

Paragraph 11 of Lantos's Complaint appears to claim that the post-offer, pre-employment physical examination occurring on April 19, 2006 was improper. 29 C.F.R. § 1630.14 (7-1-07 ed.) reads as follows:

> (a) *Acceptable pre-employment inquiry.* A covered entity may make pre-employment inquiries into the ability of an applicant to perform job-related functions, and/or may ask an applicant to describe or to demonstrate how, with or without reasonable accommodation, the applicant will be able to perform job-related functions.
>
> (b) *Employment entrance examination.* A covered entity may require a medical examination (and/or inquiry) after making an offer of employment to a job applicant and before the applicant begins his or her employment duties, and may condition an offer of employment on the results of such examination (and/or inquiry), if all entering employees in the same job category are subjected to such an examination (and/or inquiry) regardless of disability.
>
> * * *
>
> (3) Medical examinations conducted in accordance with this section do not have to be job-related and consistent with business necessity.

29 C.F.R. § 1630.14 (7-1-07 ed.). Moreover, 42 U.S.C. § 12112 (d)(3) provides that [a] covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if - (A) all entering employees are subjected to such an examination regardless of disability; . . . and (C) the results of such examination are used only in accordance with this subchapter."

9

As this Court pointed out on November 7, 2007, one of the questions is whether "the plaintiff was made to submit to an unusual, if not unique inquiry." *See* Memorandum and Order, Doc. 27, p. 13. At trial, it will be shown that this was simply not the case. In fact, on April 19, 2006, Lantos agreed as follows:

> I authorize the Company to investigate all statements contained herein, and to secure any and all information it may deem necessary concerning my previous employment and any pertinent information, personal or otherwise, from all my employers, references, and academic institutions. . . . ***I agree to furnish any additional information and complete such examinations as may be required or requested by the Company.***

*See* Joint Exhibit 2, p. 4 (emphasis added). Additionally, Lantos not only voluntarily provided Hawkins with the authorizations, but acknowledged Hawkins's ability to make further inquiry. The "Post Offer of Employment Information" specifically states:

> For the Safety of all employees and the public, Hawkins Construction Company will screen all individuals offered employment or any employee who has not worked for Hawkins Construction Company during the past twelve months. If possible, all screening will be done prior to beginning work. The screening process will include, but not be limited to, the following:
>
> A.   Drug Test
> B.   Worker Compensation and Medical History
> C.   Driving Record
>
> Refusal to submit to any of these screening tests will constitute voluntary withdrawal of employment with Hawkins Construction Company.

*See* Joint Exhibit 2, p. 9.

Once Hawkins received the June 24, 2003 "Impairment Rating", Hawkins had the right to make its own determination as to whether Lantos could perform the essential functions of the position. In this regard, the "Post Offer of Employment Information" states that "[t]he Company reserves the right to obtain independent medical qualification of the employee, and reserves the right to make its own determination whether the employee can work or not." *See* Joint Exhibit 2, p. 9.

DATED this 19th day of November, 2007.

        HAWKINS CONSTRUCTION COMPANY, Defendant

BY:  HARDING & SHULTZ P.C., L.L.O.
       ADAM J. PROCHASKA – 22307
       800 Lincoln Square
       121 S. 13th Street
       P.O. Box 82028
       Lincoln, Nebraska 68501-2028
       (402) 434-3000

BY:  s/ Adam J. Prochaska
       One of Said Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of November, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

    Joy Shiffermiller
    Shiffermiller Law Office
    3939 South Street, Suite 101
    Lincoln, NE 68506

        s/ Adam J. Prochaska
        One of Said Attorneys